**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **United States of America** | : | |
| | : | |
| **v.** | : | **No. 19-cr-315-1 (VLB)** |
| | : | |
| **Marquis Williams** | : | |
| | : | **March 23, 2023** |
| | : | |

## Memorandum of Decision on Applicability of Disputed Guidelines Enhancements

On May 19, 2022, the Defendant, Marquis Williams, pled guilty to conspiracy to commit bank fraud, in violation of section 1349 of title 18 of the United States Code.  (Plea Agreement, ECF No. 199.)  Mr. Williams entered into a plea agreement with the Government, wherein the parties agreed that under the United States Sentencing Guidelines Mr. Williams's criminal history category is VI, the base offense level is seven and Mr. Williams is subject to a two-level enhancement under section 2B1.1(b)(2)(A)(i) (because the offense involved ten or more victims).  (*Id.* 5.)  The parties noted they disagree on whether Mr. Williams is subject to (1) a ten-level enhancement under section 2B1.1(b)(1) for a total loss amount between $150,000 to $250,000, (2) a two-level enhancement under section 2B1.1(b)(11)(C)(i) for the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any means of identification, and (3) a two-level enhancement under section 3A1.1(b)(1) for having known or should have known that a victim of the offense was a vulnerable victim.

The parties jointly moved for a *Fatico* hearing, (ECF No. 211), which was conducted on October 26, 2022.  At the *Fatico* hearing, the Government called two

1

witnesses: Susan Girton, a United States Postal Service ("USPS") Inspector that investigated Mr. Williams, and; Dara Morrison, Mr. Williams's co-defendant in this action.  The Government and Mr. Williams presented evidence and arguments on the enhancements under sections 2B1.1(b)(11)(C)(i) and 3A1.1(b)(1).

During the proceeding, the Court learned that counsel for the Government and Mr. Williams did not meet and confer on the factual basis for the Government's position as to the loss amount.  In lieu of conducting a lengthy and unnecessary proceeding, the Court directed counsel to meet and confer, then report back to the Court within three weeks indicting whether the dispute persists and, if so, the specific factual and legal challenge(s) at issue.   The Government and Mr. Williams submitted supplemental briefs on the remaining issue.  (Gov.'s Suppl. Br., ECF No. 233; Def.'s Suppl. Br., ECF No. 248.)  In reviewing the parties' submissions, the Court interpreted Mr. Williams's challenge to the loss amount as purely legal.  The Court inquired of the parties to confirm this was a fair interpretation of the submission, which they confirmed and reported that no further presentation of evidence was necessary.  (Joint Response, ECF No. 255.)

After reviewing the evidence presented and the arguments raised with respect to the disputed guideline sections, the Court finds that Mr. Williams is subject to (1) a ten-level enhancement under § 2B1.1(b)(1)(A)(i), (2) a two-level enhancement under § 2B1.1(b)(11)(C)(i), and (3) a two-level enhancement under § 3A1.1(b)(1).

I.       BACKGROUND

In July 2019, the USPS began receiving reports of mail theft and check fraud.  (Tr. 6–7, ECF No. 254.) The USPS Inspector's office suspected the reports of theft and fraud were attributable to Mr. Williams and his co-defendant Ms. Morrison.  (Tr. 6–7.)  After identifying these suspects, law enforcement investigated whether and to what extent these individuals were responsible. (*Id.* 10–11.)  The investigation involved a "trash pull," and obtaining and then executing a search warrant of the defendants' home and vehicles.  (*Id.*)

Law enforcement uncovered evidence of check fraud within the property controlled by the defendants.  (*Id.* 11–12.)  For example, law enforcement uncovered checks and money orders at various stages of alteration or counterfeiting.  (*Id.*)  They also found tools for counterfeiting, such as a razor blade, mending tissue, glue sticks, and color pencils.  (*Id.*)  Further, law enforcement found ID cards, a pistol permit, two passports, and two social security cards.  (*Id.*)

During the investigation, law enforcement uncovered several documents within Mr. Williams's home that were addressed to a rehabilitation and assisted living facility, also known as a nursing home.  (*Id.* 18–19.)  The documentation uncovered included the nursing home's business records (including insurance and social security administration forms) and resident bank statements, all of which contain personal identifying information of nursing home employees and residents.  (Ex. 112.)

Several items bearing the name of one nursing home resident identified as KR were found during the execution of the search warrant of Mr. Williams's home and vehicles.  This included bank statement for KR addressed to the nursing home, which showed he only received deposits from two sources: the United States Department of Veterans Affairs and the United States Social Security Administration.  (*Id.*)  Law enforcement discovered a new debit card in KR's name, that was used by Mr. Williams and Ms. Morrison.  (Tr. 35–37.)  Law enforcement also discovered four other bank cards in KR's name while executing the warrant.  (*Id.* 39–40.)  Further, they found three Connecticut Department of Motor Vehicle ("DMV") temporary identification cards with KR's name on it, but were altered with a photo of Mr. Williams.  (*Id.* 40–41; Ex. 111.)  Law enforcement contacted and interviewed KR upon discovering his victimization.  (*Id.* 25–27.)  At the time of the interview, KR was 91 years old.  (*Id.*)

Mr. Williams actively participated in the *Fatico* hearing from the defense table, during which time he was not under oath nor subject to the Government's cross examination.  From the defense table, Mr. Williams admitted that he would take mail from mailboxes, including the mailboxes that contained mail for the aforementioned nursing home.  (*Id.* 78.)  He stated that sometimes he read the mail and sometimes he did not.  (*Id.* 78–79.)  He summarized his conduct as: "I just find the check, a name, and make the attempt."  (*Id.* 79.)

Ms. Morrison testified at the *Fatico* hearing, first explaining that her relationship with Mr. Williams began in the late 1990's.  (*Id.* 87–88.)  The two defendants were in a long term, toxic, on-again off-again relationship spanning

approximately 20 years prior to their arrests for the underlying offense conduct. (*Id.*)  They share three children.  (*Id.*)  Ms. Morrison and Mr. Williams were both charged in the underlying a multi-count indictment with offenses including conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349.  (ECF No. 41.) On May 12, 2021, Ms. Morrison pled guilty to count one of the indictment charging conspiracy to commit bank fraud.  (ECF No. 149.)  Ms. Morrison stipulated to the following offense conduct:

1. Since at least 2018 through in or about November 2019, the defendant, Dara Morrison, and her co-defendant, Marquis Williams (collectively "the defendants"), conspired and engaged in an extensive mail theft, bank fraud, and identity, theft scheme. As detailed in Appendix A, as of the date of the guilty plea, there are more than seventy identified bank fraud victims, and, the total intended loss is approximately $1,76,868.26. There are also hundreds of mail theft victims.

2. Specifically, as to Count One of the indictment, the defendant, acting with the intent to defraud, knowingly and willfully executed a scheme with coconspirator Marquis Williams to defraud financial institutions insured by the Federal Deposit Insurance Corporation.

3. Throughout the course of their scheme, the defendants stole mail containing checks, driver's licenses, passports, social security cards, banking information, and other personally identifying information from businesses and individuals throughout Connecticut, including, but not limited to, elderly nursing home residents. [Footnote 1: The elderly nursing home residents are "vulnerable victims" pursuant to U.S.S.G. § 3A1.1(b)(1) which provides for a two level enhancement.] The defendants used the stolen mail to engage in criminal conduct designed to enrich themselves financially.

4. To effectuate their scheme, the defendants used stolen identities, including, but not limited to, those of elderly nursing home, residents, and produced and used fake identification.

5. As part of their scheme, using fake and stolen identification, the defendants cashed, or attempted to cash, and deposited stolen checks that they altered to reflect their own names, or, in some instances, the names of identity theft victims. The defendants also used the stolen checks to create additional, forged copies of checks

5

that they then cashed, attempted to cash, and deposited into accounts they controlled.

6. The defendants also used fake and stolen identities to open bank accounts that they controlled. The defendants used these bank accounts to deposit stolen and forged checks and to make withdrawals. Additionally, the defendant, Dara Morrison, used and attempted to use stolen credit cards to enrich herself.

7. On May 31, 2019, as captured on surveillance footage, Dara Morrison cashed a fraudulent check in the amount of $1,479.13 at a People's United Bank branch, a financial institution then insured by the Federal Deposit Insurance Corporation. The check was drawn on an account in the name of victim Diesel Lounge.

(*Id.*) Ms. Morrison testified that the stipulated offense conduct correctly details her and Mr. Williams's conduct on the underlying conspiracy charge. (Tr. 93.)

Ms. Morrison also provided details as to the offense conduct during her testimony. She explained that she would cash the checks printed and altered by Mr. Williams. (*Id.* 94–96.) Ms. Morrison said that they would steal mail from the nursing home mentioned above on a daily basis and she had a contact—her cousin—who worked for the nursing home and would provide her with information on the victims. (*Id.* 99.) Specific to the victim with the initials KR, Ms. Morrison testified that she knew he was born in the 1920's, that he had no family, but that he did have money. (*Id.* 99–100.) She did not know anything about his health or ability to understand or function. (*Id.* 111.) Ms. Morrison estimated that she and Mr. Williams stole about $300,000 to $350,000. (*Id.* 99.)

## II.   LEGAL STANDARD

Section 3553(a) of Title 18 of the United States Code requires the court, when fashioning a sentence, to consider "the kinds of sentence and the sentencing range" as set forth in the United States Sentencing Guidelines. Even though the district court is not bound to apply the Guidelines, it "must consult

those Guidelines to take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 264 (2005).  Thus, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007).

"The Government bears the burden of proving the facts supporting the application of a Guidelines provision, and it must do so by a preponderance of the evidence." *United States v. Kent*, 821 F.3d 362, 368 (2d Cir. 2016).  "The Government may meet its burden with direct evidence, and it may also use circumstantial evidence." *United States v. Ward*, No. 3:17-CR-171 (MPS), 2019 WL 6255198, at *2 (D. Conn. Nov. 22, 2019) (citing to *United States v. Ulbricht*, 858 F.3d 71, 125 (2d Cir. 2017)).

III.    DISCUSSION

A.    Loss Amount, Section 2B1.1(b)(1)

The first disputed guideline enhancement is under section 2B1.1(b)(1).  The parties agree that section 2B1.1(a) (Theft, Property Destruction, and Fraud) is applicable to the offense of conviction and that the base offense level is seven under section 2B1.1(a)(1).  The  parties dispute what enhancement level under subsection (b)(1) applies.  This subsection, titled "Specific Offense Characteristics," provides that "If the loss exceeded $6,500, increase the offense level as follows:"

| Loss (Apply the Greatest) | | Increase in Level |
|---|---|---|
| (A) | $6,500 or less | no increase |
| (B) | More than $6,500 | add **2** |
| (C) | More than $15,000 | add **4** |
| (D) | More than $40,000 | add **6** |
| (E) | More than $95,000 | add **8** |
| (F) | More than $150,000 | add **10** |
| (G) | More than $250,000 | add **12** |
| (H) | More than $550,000 | add **14** |
| (I) | More than $1,500,000 | add **16** |
| (J) | More than $3,500,000 | add **18** |
| (K) | More than $9,500,000 | add **20** |
| (L) | More than $25,000,000 | add **22** |
| (M) | More than $65,000,000 | add **24** |
| (N) | More than $150,000,000 | add **26** |
| (O) | More than $250,000,000 | add **28** |
| (P) | More than $550,000,000 | add **30**. |

The commentary following this guideline defines loss as <u>the greater of actual or intended loss</u>. U.S.S.G. § 2B1.1, Application Notes 3(A).[1]

The parties dispute what level enhancement applies.  The Government presented through its witness a demonstrative exhibit that the loss amount attributable to Mr. Williams was  $176,868.26, which is inclusive of at least 64

---

[1] The commentary further states that: "actual loss means the reasonably foreseeable pecuniary harm that resulted from the offense."  U.S.S.G. § 2B1.1, Application Notes 3(A)(i).  "For purposes of this guideline, 'reasonably foreseeable pecuniary harm' means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense."  *Id.* at 3(A)(iv).  Intended loss means "the pecuniary harm that the defendant purposefully sought to inflict; and includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value)."  *Id.*

transactions, some of which involved an actual loss and some involving an intended loss.[2]  Mr. Williams does not dispute the contents of this demonstrative exhibit, nor does he challenge the witnesses' testimony that the exhibit is an accurate summary of the investigation conclusions.  Rather, Mr. Williams argues the loss amount enhancement should not include any of the intended loss calculations, which he argues reduces his loss amount enhancement to eight-levels.

In order to determine whether this commentary is to be afforded weight, the Court will begin at the beginning—the promulgation of the United States Sentencing Commission and the Guideline Manual.  The Sentencing Reform Act of 1984, PL 98-473, §§ 211–39 created the Commission and tasked it with establishing sentencing policies and practices for the Federal criminal justice system.  18 U.S.C. § 991(b).[3]  Congress directed the Commission to promulgate

---

[2] Exhibit A identifies the actual loss amount as $116,152.26 and the intended loss amount as $60,716.00.

[3] Section 991(b) provides in full:

>     (b) The purposes of the United States Sentencing Commission are to--
>
>         (1) establish sentencing policies and practices for the Federal criminal justice system that--
>
>             (A) assure the meeting of the purposes of sentencing as set forth in section 3553(a)(2) of title 18, United States Code;
>
>             (B) provide certainty and fairness in meeting the purposes of sentencing, avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct while maintaining sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices; and

guidelines and policy statements for criminal sentencings.  18 U.S.C. § 994(a).

Congress required that amendments to the guidelines be submitted to Congress

six months prior to becoming effective, during which time Congress can modify

or disapprove them.  § 994(p).

In fulfilling its duty, the Commission promulgated the Guideline Manual,

which includes guidelines as well as extensive commentary on each guideline.

The Sentencing Reform Act does not expressly authorize issuance of

commentary, but it does direct courts to consider the "official commentary of the

Sentencing Commission" when fashioning a sentence.  18 U.S.C. § 3553(b).

Guideline section 1B1.7 identified the purposes of the commentary, explaining

that:

> The Commentary that accompanies the guideline sections may serve
> a number of purposes.  First, it may interpret the guideline or explain
> how it is to be applied.  Failure to follow such commentary could
> constitute an incorrect application of the guidelines, subjecting the
> sentence to possible reversal on appeal.  See 18 U.S.C. §
> 3742.[4]  Second, the commentary may suggest circumstances
> which, in the view of the Commission, may warrant departure from
> the guidelines.  Such commentary is to be treated as the legal
> equivalent of a policy statement.  Finally, the commentary may
> provide background information, including factors considered in
> promulgating the guideline or reasons underlying promulgation of
> the guideline.  As with a policy statement, such commentary may
> provide guidance in assessing the reasonableness of any departure
> from the guidelines.

---

> (C) reflect, to the extent practicable, advancement in
> knowledge of human behavior as it relates to the
> criminal justice process; and
> (2) develop means of measuring the degree to which the
> sentencing, penal, and correctional practices are effective in
> meeting the purposes of sentencing as set forth in section
> 3553(a)(2) of title 18, United States Code.

[4] 18 U.S.C. § 3742 provides law for reviewing a sentence on appeal.  Some of the
provisions of this statute have held unconstitutional in *Booker*, 543 U.S. 220 and
it progeny to the extent it makes the Guidelines mandatory.

The Supreme Court addressed the weight to be afforded to commentary in the Guidelines Manual in *Stinson v. United States*, 508 U.S. 36 (1993).  In *Stinson*, the Supreme Court held that the commentary in the Guidelines Manual is authoritative unless it violates the Constitution or a federal statue, or is inconsistent with, or a plainly erroneous reading of, that guideline.  *Id.* at 38.  The Court reasoned that "this type of commentary is akin to an agency's interpretation of its own legislative rules," which at the time was known as *Seminole Rock* defense.  *Id.* at 44–45.[5]

Since *Stinson*, the deference standard applied there—then known as *Seminole Rock* deference—was renamed *Auer* deference, named after *Auer v. Robbins*, 519 U.S. 452 (1997).  Notwithstanding the name change, the test remained the same: an agency's interpretation of their own regulation is

---

[5] In *Stinson*, the underlying dispute related to the career offender enhancement in section 4B1.2.  The guideline required that the instant offense be either a "crime of violence or a controlled substance offense."  *Id.* at 38.  The definition for "crime of violence" was "any offense under federal or state law punishable by imprisonment for a term exceeding one year that . . . involves conduct that presents a serious potential risk of physical injury to another."  *Id.* (citing to § 4B1.2(1)).  The district court interpreting the definition of "crime of violence," included the offense of felon-in-possession of a firearm.  *Id.* 38–39.  The court of appeals affirmed, but thereafter, the commentary to this guideline was modified to explicitly exclude felon-in-possession of a firearm as a "crime of violence."  *Id.* at 39.  On rehearing after publication of the new commentary, the court of appeals found the commentary was non-binding.  *Id.* The Supreme Court applied the holding discussed above and found "the exclusion of the felon-in-possession offense from the definition of "crime of violence" may not be compelled by the guideline test" but nonetheless "does not run afoul of the Constitution or federal statute, and it is not 'plainly erroneous or inconsistent' with § 4B1.2 . . . ."  *Id.* at 47.  The commentary was deemed binding and federal courts may not use the felon-on-possession offense as the predicate crime of violence for the purpose of the career offender enhancement.  *Id.*

"controlling unless 'plainly erroneous or inconsistent with the regulation.'"  *Id.* at 461.

In 2019, the Supreme Court spoke again on *Auer* deference, this time with stark clarity.  In *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), five Justices of the Supreme Court came together to keep *Auer* deference alive over the passionate dissents of the other four Justices.  Writing for the pro-*Auer* Justices, Justice Kagan provided a detailed history and justification for *Auer* deference prior to clarifying the test for determining when deference should not be afforded.  *Id.* at 2410–18 (providing in part II.A the history and justification of *Auer* where only four justices concur, and part II.B providing standard for when not to apply it, where five justices concur).  The test for affording deference to an agency's interpretation of its own rules that was adopted by a majority of the Justices of the Supreme Court requires a court to first consider whether the rule is "genuinely ambiguous."  *Id.* at 2415.  In determining whether a rule is "genuinely ambiguous," "a court must exhaust all the 'traditions tools' of construction."  *Id.* Meaning, a court must carefully consider "the text, structure, history, and purpose of a regulation."  *Id.*  If the rule is genuinely ambiguous, a court must ask if the interpretation is reasonable and must "make an independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight."  *Id.* at 2416.  Furthermore, an agency interpretation is not entitled to deference unless it is one actually made by the agency and implicates the agency's substantive expertise.  *Id.* at 2416–17.  Finally, the interpretation must reflect "fair and considered judgment."  *Id.* at 2417.

The issue now is whether, under recent Supreme Court precedent in *Kisor*, the commentary to section 2B1.1 defining the word "loss" as "the greater of actual or intended loss," is entitled to controlling weight.  The Third Circuit said no in *United States v. Banks*, 55 F.4th 246 (3rd Cir. 2022) , where the defendant was convicted by a jury of wire fraud in connection with a scheme where he tried to draw funds from a bank account with insufficient funds and withdraw the deposit before the insufficiency was realized.  *Id.* at 251.  Though he attempted to make 70 withdrawals/transfers for a total of $324,000, the Bank thwarted every attempt.  *Id.*  The bank did not suffer a loss.  At sentencing, the district court computed the defendant's total offense level under the Guidelines by relying on the commentary that defines "loss" as the "greater of the actual or intended loss."  *Id.* at 253.  The district court found the intended loss was $324,000 and thus his base offense level increased by 12.  *Id.*  The defendant argued that the district court erroneously relied on the commentary defining loss as the greater of the actual or intended loss because the guideline itself does not define loss as inclusive of intended loss.  *Id.* at 255.  The Third Circuit began its analysis of this argument with the language of *Kisor*, which, as explained above, requires 'genuine ambiguity' before turning to an agency interpretation of its own rules. *Id.* at 255–56.  The Third Circuit, found the ordinary meaning of 'loss' is "actual loss" and then cited to a handful of dictionary definitions of loss to support that finding.  *Id.* at 257–58.  The court concluded the commentary expands the definition of 'loss' and thus, the commentary could be afforded no weight.  *Id.* The

Third Circuit decision in *Banks* is non-binding on this Court, but it may serve as persuasive authority.

The Second Circuit has a long history of applying and passively adopting the disputed commentary on intended loss.[6]  However, the Second Circuit has not yet addressed the weight to be afforded to the commentary after *Kisor.* Thus, the Court will determine whether the commentary should be afforded weight under the standards articulated in *Kisor.*

The Supreme Court has explained that a "court *must exhaust all* the 'traditional tools' of construction," before concluding that a rule is genuinely ambiguous."  *Kisor*, 139 S. Ct. at 2415 (emphasis added).  "[O]nly when that legal toolkit is empty and the interpretative question still has no single right answer can a judge conclude that it is 'more [one] of policy than of law.'" *Id.* "To make that effort, a court must 'carefully consider[]' the text, structure, history, and purpose of a regulation, in all the ways it would if it had no agency to fall back on." *Id.*

The Court begins this analysis with a brief summary on the "traditional tools of construction."  *Id.* at 2415.[7]  The first step is to look at "the language

---

[6] *United States v. Caltabiano*, 817 F.3d 210, 219 (2d Cir. 2017); *United States v. Binday*, 804 F.3d 558, 595 (2d Cir. 2015); *United States v. Iovino*, 777 F.3d 578, 580 n.1(2d Cir. 2015); *United States v. Corsey*, 723 F.3d 366, 375 (2d Cir. 2013); *United States v. Lacey*, 699 F.3d 710, 718 (2d Cir. 2012); *United States v. Hsu*, 669 F.3d 112, 120 (2d Cir. 2012); *United States v. Skys*, 637 F.3d 146, 153 (2d Cir. 2011); *United States v. Ravelo*, 370 F.3d 266, 270–73 (2d Cir. 2004).

[7] The Supreme Court in *Kisor* did not engage in an analysis of whether an agency regulation was genuinely ambiguous after application of the traditional tools of construction, rather it directed the court of appeals to on remand.  *Id.* 2423–24.

itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). Focusing on a single term out of context does not satisfy this standard. For example, in *Robinson*, the Supreme Court was asked to decide whether the term "employees," as used in 42 U.S.C. § 704(a), includes former employees. *Id.* at 339. The Court began by looking at the language and noted that "[a]t first blush, the term 'employees' in § 704(a) would seem to refer to those having an existing employment relationship with the employer in question." *Id.* at 341. Notwithstanding this initial impression of the term in insolation, the Court found such an interpretation "does not withstand scrutiny in the context of" the statute. *Id.* In reaching this conclusion, the Court considered whether there were any limiting qualifiers used before the term and reviewed other sections of the statutory scheme. *Id.* at 341–44. *Robinson* teaches that terminology should not be read in a vacuum when determining ambiguity, rather, a court is to consider the text and the context in which the terminology is used.

Here, the issue, like the issue in *Robinson*, is the meaning of a single word, which in this case is "loss." Also similar to *Robinson*, on first impression it appears reasonable that Mr. Williams and the Third Circuit believe "loss," when analyzed in a vacuum, means only "actual loss." *See Banks*, 55 F.4th at 258.[8]

---

[8] The Third Circuit relied on the following dictionary definitions of "loss" in its decision:

> The 1993 edition of *Webster's New International Dictionary* defines "loss" as: (a) the act or fact of losing; (b) a person or thing or an amount that is lost; (c) the act or fact of failing to gain, win, obtain, or utilize; (d) A decrease in amount, magnitude, or degree; (e) the state or fact of being destroyed or placed beyond recovery; and (f) the

This is where the Third Circuit ended its inquiry, but to do so would be contrary to the Supreme Court directive to apply all traditional tools of construction and to consider the context in which the language is used and the context of the scheme as a whole.  *Kisor*, 139 S. Ct. at 2415; *Robinson*, 519 U.S. at 341.

First, in the context in which the language is used, while it is true that the guideline does not use the phrase "intended loss," it is also true that it does not use the phrase "actual loss."  The Commission knew how to qualify "loss" to actual loss suffered by the victim based on the qualifiers it used in section 2B3.2(b)(2), which uses the phrase "the loss to the victim," and in section 2C1.1(b)(2), which uses the phrase "loss to the government from the offense."

---

amount of an insured's financial detriment due to the occurrence of a stipulated contingent event.

The 1988 edition of *Webster's Ninth New Collegiate Dictionary* defines "loss" as: 1a: the act of losing possession b: the harm or privation resulting from loss or  separation c: an instance of losing 2: a person or thing or an amount that is lost . . . 3 a: failure to gain, win, obtain, or utilize b: an amount by which the cost of an article or service exceeds the selling price 4: decrease in amount, magnitude, or degree 5: destruction, ruin 6: the amount of an insured's financial detriment by death or damage that the insurer become liable for . . . . In collecting dictionary definitions of "loss," the United States Court of Appeals for the Sixth Circuit wrote that: One dictionary defines the word to mean, among other things, the "amount of something lost" or the "harm or suffering caused by losing or being lost." *American Heritage Dictionary of the English Language* 1063 (3d ed. 1992). Another says it can mean "the damage, trouble, disadvantage, [or] deprivation . . . caused by losing something" or "the person, thing, or amount lost." *Webster's New World College Dictionary* 799 (3d ed. 1996). A third defines it as "the being deprived of, or the failure to keep (a possession, appurtenance, right, quality, faculty, or the like)," the "[d]iminution of one's possessions or advantages," or the "detriment or disadvantage involved in being deprived of something[.]" 9 *Oxford English Dictionary* 37 (2d ed. 1989). (internal footnotes omitted).

Thus, in the context in which "loss" is used under section 2B1.1(b), the term loss is not given the limiting qualifiers that the Commission knew how to and in fact did use.

Next, the Court must also consider if the term "loss," is ambiguous when considering it in the context of the Guidelines as a whole.  The Guidelines have a guideline on how to calculate an applicable guideline range.  § 1B1.1.[9]  Section 1B1.2(b) requires, among other things, that the determination of the applicable guideline range be in accordance with § 1B1.3 (Relevant Conduct).  Section 1B1.3 provides:

> (a) <u>Chapters Two (Offense Conduct) and Three (Adjustments)</u>.  Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:
>
>> (1)     (A)     all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>>
>> (B)     in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were—

---

[9] Section 1B1.1 requires the court to go through the Guideline Manual in a specific order, with some exception, to calculate the guideline range.  The court is to begin by calculating the total offense conduct, which requires the court to determine the offense guideline section under Chapter Two for the offense of conviction, what the base offense level is, consider whether any special offense characteristics apply, and whether any adjustments under Chapter Three apply (including determining grouping).  § 1B1.1(a)(1–5).  The court is then to determine the defendants criminal history category as defined in Chapter Four.  § 1B1.1(a)(6).  The court is then to determine the guideline range with the total offense level and criminal history category as provided for in the Sentencing Table in Chapter Five.  § 1B1.1(a)(7).

(i)     within the scope of the jointly undertaken criminal activity,

(ii)     in furtherance of that criminal activity, and

(iii)     reasonably foreseeable in connection with that criminal activity;

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

(2)     solely with respect to offenses of a character for which §3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

(3)     all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, *and all harm that was the object of such acts and omissions;* and

(4)     any other information specified in the applicable guideline.

(Emphasis added).  Of particular importance for this decision is the language that provides that the offense conduct is to be based on "all harm that was the object of such acts and omissions."  This instruction on calculating an offense level, requires consideration not only of the actual harm, but the intended harm (i.e., actual loss AND intended loss).  Thus, a reading that "loss" is just "actual loss" would be in conflict with section 1B1.3.

Further, interpreting "loss" as only "actual loss" would be in conflict with the purpose for establishing the Sentencing Commission.  As stated above, when Congress established the Commission, it directed the Commission to "establish sentencing policies and practices for the Federal criminal justice system that—(A) assure the meeting of the purposes of sentencing as set forth in section 3553(a)(2) of title 18, United States Code . . . ."  18 U.S.C. § 991(b)(1).  Section

18

3553(a)(2) requires that a court, in determining the particular sentence to be imposed, to consider—

> (2) the need for the sentence imposed--(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. . . .

A guideline that imposes incremental penalty for theft crimes based only on "actual loss" and not "intended loss" would not achieve the purpose of this directive. This is best illustrated through juxtaposing the following hypotheticals. In case A: John Doe steals a piece of USPS mail that he knows to contain a $25 gift card. In case B: Jane Doe breaks into Fort Knox, carries away $1,000,000 worth of gold, but is caught a week later and all of the gold is returned. Case B is considerably more serious than case A, but, under the framework proposed by the defendant where "loss" means only "actual loss," the Guideline range between John and Jane Doe would be the same, assuming all other things are equal. Such an interpretation would not "reflect the seriousness of the offense conduct," "promote respect for the law," and "provide just punishment for the offense." In addition, equal treatment of John and Jane Doe would not afford an adequate deterrence to people who wish to attempt to steal at high values. For the above reasons, the Court finds that "loss" as used in section 2B1.1 is genuinely ambiguous.

Now, that the Court has found the rule genuinely ambiguous, *Kisor* directs to Court to ask if the if the interpretation is reasonable and whether the character and context of the agency interpretation is entitled to controlling weight after an

independent inquiry.  139 S. Ct. at 2416.  The Court's earlier discussion and repudiation of the actual-loss-only interpretation sufficiently addresses this question.  As detailed above, when loss includes the greater of the actual or intended loss, the purpose of the Guidelines is met.  For the same reasons, the Court finds that the commentary interpretation of "loss" is a "fair and considered judgment."  *Id.* at 2417.  Thus, the guideline commentary defining loss ad "the greater of actual loss or intended loss," is entitled to controlling weight.

Accordingly, the Court rejects Mr. Williams's argument that the intended loss commentary is to be afforded no weight.  The Government has set forth evidence showing that the total loss amount—when applying the "loss" commentary—is between $150,000 and $250,000, of which Mr. Williams does not dispute.  The Court finds the ten-level enhancement under section 2B1.1(b)(1)(F) applies to the offense conduct Guidelines calculation.

B.    Use of Identification, Section 2B1.1(b)(11)(C)(i)

Mr. Williams disputes application of a two-level enhancement under section 2B1.1(b)(11)(C)(i), which provides that: "If the offense involved . . . the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification, . . . increase by 2 levels."  The commentary to this guideline provides:

> 1. "Means of identification" has the meaning given that term in 18 U.S.C. § 1028(d)(7), except that such means of identification shall be of an actual (<u>i.e.</u>, not fictious individual, other than the defendant or a person for whose conduct the defendant is accountable under § 1B1.3 (Relevant Conduct). . . .
>
> 10. . . .
>
> (C)  <u>Application of Subsection (b)(11)(C)(i)</u>.—

20

**(i)   In General.**—Subsection (b)(11)(C)(i) applies in a case in which a means of identification of an individual other than the defendant (or a person for whose conduct the defendant is accountable under §1B1.3 (Relevant Conduct)) is used without that individual's authorization unlawfully to produce or obtain another means of identification.

**(ii)   Examples.**—Examples of conduct to which subsection (b)(11)(C)(i) applies are as follows:

> **(I)   A defendant obtains an individual's name and social security number from a source (e.g., from a piece of mail taken from the individual's mailbox) and obtains a bank loan in that individual's name. In this example, the account number of the bank loan is the other means of identification that has been obtained unlawfully.**

> **(II)   A defendant obtains an individual's name and address from a source (e.g., from a driver's license in a stolen wallet) and applies for, obtains, and subsequently uses a credit card in that individual's name. In this example, the credit card is the other means of identification that has been obtained unlawfully.**

**(iii)   Non-Applicability of Subsection (b)(11)(C)(i).**—Examples of conduct to which subsection (b)(11)(C)(i) does not apply are as follows:

> **(I)   A defendant uses a credit card from a stolen wallet only to make a purchase. In such a case, the defendant has not used the stolen credit card to obtain another means of identification.**

> **(II)   A defendant forges another individual's signature to cash a stolen check. Forging another individual's signature is not producing another means of identification.**

USSG § 2B1.1, comment. (n.10).

Mr. Williams argues that the fake identification he used was created from an identification that was clearly marked "not to be used for ID," which he argues makes this case more akin to forging a signature and thus not subject to the enhancement.  Mr. Williams appears to be arguing, without citing to any legal authority, that the original "means of identification" used to create "any other

means of identification" must be a government authorized form of identification (such as an official driver's license or passport).

The issue here is what constitutes a "means of identification" as used in the guideline. The Second Circuit has relied on the definition of "means of identification" from 18 U.S.C. § 1028(d)(7). *See United States v. Sash*, 396 F.3d 515, 521 (2d Cir. 2005). *See also United States v. Norwood*, 774 F.3d 476, 480 (11th Cir. 2014). Section 1028(d)(7) defines "means of identification as:

> any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any-
>
> > (A) name, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number;
> >
> > (B) unique biometric data, such as fingerprint, voice print, retina or iris image, or other unique physical representation;
> >
> > (C) unique electronic identification number, address, or routing code; or
> >
> > (D) telecommunication identifying information or access
> >
> > device (as defined in section 1029(e));

Mr. Williams's argument fails under the guideline commentary[10] and under the plain meaning of "means of identification" as defined in 18 U.S.C. § 1028(d)(7). The commentary and section 1028(d)(7) provide that the original "means of identification" does not need to be a formal identification card, as

---

[10] Mr. Williams does not argue that the commentary to this guideline is not entitled to controlling weight like he did with the loss amount commentary discussed above. The Court will not engage in the exhausting task of applying the *Kisor* steps for affording *Auer* deference where no argument is raised. However, a cursory review shows that the term "means of identification" is a legal term of art defined under statutory law, as discussed above.

suggested by Mr. Williams.  Rather, they provide that the original "means of identification" can be an unlawfully obtained name and social security number for another.  Mr. Williams unlawfully obtained KR's name, address, and social security number, then used that information to open bank accounts and obtain bank cards in KR's name.  Thus, Mr. Williams did use a means of identification (KR's name, social security number, date of birth) to produce other means of identification (a new bank account with a bank account number and bank cards).

Accordingly, the Court finds that Mr. Williams is subject to the two-level enhancement under section 2B1.1(b)(11)(C)(i).

C.    Vulnerable Victim Enhancement, § 3A1.1(b)(1)

Mr. Williams disputes application of a two-level enhancement under section 3A1.1(b)(1), which provides that: "If the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by 2 levels." "Section 3A1.1(b) does not require that the defendant select the victim because of his or her vulnerability—it is sufficient that he knew or should have known of this quality when deciding to go ahead with the crime." *United States v. Palmer*, 830 F. App'x 26, 28 (2d Cir. 2020).  "[B]eing elderly is alone insufficient to render an individual 'unusually vulnerable' within the meaning of 3A1.1(b) . . . ." *Id.* There must be some other indicator of vulnerability, such as in *Palmer* where the court found elderly people are unusually vulnerable to telemarketing fraud schemes. *Id.*

Mr. Williams argues he had no way of knowing, nor should he have known, that any of his victims were unusually vulnerable.  The Court rejects this

argument.  The Government presented credible evidence that documentation within Mr. Williams's control and documentation he personally reviewed in conducting the offense conduct demonstrated that one specifically targeted victim, KR, was elderly, in a nursing home, and receiving only social security and veterans benefits.  Further, his co-conspirator solicited and received information relating to the victims vulnerabilities from a nursing home employee who improperly accessed patient information.  A person of such an advanced age, who live in a nursing home setting for care, and has limited resources, is vulnerable.  And that vulnerability is apparent in the documentation Mr. Williams possessed and reviewed.  The victim's vulnerability was also more likely than not shared with Mr. Williams by his co-conspirator that received information about the victim from a person involved in the victim's care.

Accordingly, the Court finds that Mr. Williams is subject to the two-level enhancement under section 3A1.1(b)(1).

## IV.    CONCLUSION

For the above reasons, the Court finds that Mr. Williams is subject to (1) a ten-level enhancement under § 2B1.1(b)(1)(A)(i), (2) a two-level enhancement under § 2B1.1(b)(11)(C)(i), and (3) a two-level enhancement under § 3A1.1(b)(1).

IT IS SO ORDERED.

_____/s/_____
**Hon. Vanessa L. Bryant**
**United States District Judge**

**Dated this day in Hartford, Connecticut: March 23, 2023**